UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:

South Broadway Realty Enterprise, Inc.,                      Case No.: 8-23-74237-ast
                                                             Chapter 11

                                   Debtor.
----------------------------------------------------------------X

## MEMORANDUM OPINION AND ORDER AWARDING
## <u>CHAPTER 11 TRUSTEE'S COMMISSION UNDER 11 U.S.C. § 326(a)</u>

### PRELIMINARY STATEMENT

Pending before the Court is a request for compensation from the chapter 11 trustee, Allan B. Mendelsohn (the "Trustee"), and an objection to such request (the "Objection") from the United States Trustee (the "UST"). The Trustee's request is made under 11 U.S.C. § 326(a) for commissions arising from the sale of real property belonging to the debtor, which resulted in a surplus estate. The issue before the Court is one of first impression in the Second Circuit: whether § 326(a) permits a chapter 11 trustee to be compensated for disbursements made to former equity security holders in accordance with a confirmed plan. For the following reasons, the Court concludes that the Trustee is permitted to receive such compensation, and thus, the Objection is overruled.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On November 13, 2023, South Broadway Realty Enterprise, Inc. ("Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") [Dkt. No. 1].

On February 24, 2025, Dime Community Bank ("Dime") filed a motion to dismiss the Chapter 11 case under 11 U.S.C. § 1112(b) (the "Motion to Dismiss") [Dkt. No. 93]. Debtor filed a timely objection to the Motion to Dismiss. [Dkt. No. 99].

On March 19, the Court held a hearing on the Motion to Dismiss, as well as an adjourned status conference, a confirmation hearing on Debtor's proposed plan of reorganization, and a hearing on Debtor's counsel's motion to withdraw (the "March 19 Hearing") [Dkt. Nos. 94, 96]. During the March 19 Hearing, the Court learned that Debtor's principal, Francesco Guerrieri (the "Principal"), had made unauthorized withdrawals from the Debtor-in-possession bank account.

On March 20, the Court entered an order requiring Debtor to comply with the following by March 31, otherwise a chapter 11 trustee would be appointed: (1) file an amended chapter 11 plan which included a signed, bona fide contract for sale of Debtor's property; (2) file all outstanding monthly operating reports through February 2025; and (3) restore its Debtor-in-Possession bank account to $150,000.00 to account for the Principal's unauthorized withdrawals and file proof of compliance (the "Chapter 11 Trustee Order") [Dkt. No. 101].

On March 31, Debtor filed a letter requesting a two-week extension of the deadlines of the Chapter 11 Trustee Order [Dkt. No. 105]. On April 1, Dime filed an objection to this request [Dkt. No. 106].

On April 3, the Court entered an order denying Debtor's extension request and directing the UST to appoint a chapter 11 trustee [Dkt. No. 108].

On April 9, the UST filed a motion to appoint Allan B. Mendelsohn as the Chapter 11 trustee [Dkt. No. 111]. On April 11, the Court entered an order approving Mendelsohn as chapter 11 trustee [Dkt. No. 112]. On April 14, the Trustee filed a statement accepting his appointment [Dkt. No. 115].

On June 13, the Trustee filed a motion under 11 U.S.C. § 363(f) for an expedited hearing to consider the Trustee's sale of Debtor's real property known as 640 South Broadway, Hicksville, NY (the "Property"), for $2,900,000.00 (the "363 Motion") [Dkt. Nos. 144, 146].

On June 20, the Trustee filed a Chapter 11 liquidation plan which provided that, based on the sale price of $2,900,000.00, general unsecured creditors would receive a 100% distribution [Dkt. No. 151].

On July 9, the Court held a hearing on the 363 Motion and directed the Trustee to conduct an online auction sale to allow interested buyers an opportunity to bid on the Property (the "Auction").

On July 15, the Trustee held the Auction and obtained a successful bid for the Property of $4,000,000.00.

On July 18, the Trustee filed a second amended plan of liquidation (the "Plan") and a second amended disclosure statement (the "Disclosure Statement") which provided for the sale of Debtor's Property for $4,000,000.00 [Dkt. Nos. 163, 165]. According to the Plan and Disclosure Statement, the sale proceeds from the Auction resulted in a surplus estate after a 100 percent distribution to all creditors. The Plan defined several key terms which are discussed *infra*.

On July 21, the Court entered orders conditionally approving the Disclosure Statement, scheduling Debtor's confirmation hearing for September 10, 2025, and granting the 363 Motion. [Dkt. Nos. 168, 169].

On September 10, the Court held the confirmation hearing.

On September 24, the Court entered an amended order approving the 363 Motion which increased the purchase price of the Property from $2,900,000.00 to $4,000,000.00 [Dkt. No. 181]. The Court also entered an order approving the sale under 11 U.S.C. § 363(f) [Dkt. No. 182].

On October 1, the Court entered an order approving the Disclosure Statement on a final basis and confirming the Plan [Dkt. No. 185].

After the sale closed, on November 7, the Trustee filed a final fee application in which he requested a total commission of $141,034.71 based on disbursements of $4,126,156.66, and a reimbursement of expenses of $368.00 (the "Fee App") [Dkt. No. 191]. According to the Fee App, an anticipated disbursement of over $800,000.00 would be made to Debtor's equity security holders in accordance with the Plan and Disclosure Statement [*Id.*].

On December 10, the Court held a hearing on the Fee App. At the hearing, the Trustee highlighted a part of his fee request which included commissions for the disbursement of the surplus funds to Debtor's former equity security holders. The UST also notified the Court that they intended to object to this request on the basis that § 326(a) does not permit a chapter 11 trustee to collect commissions for disbursements to former equity owners. Based on this information, the Court set out a briefing schedule.

On January 16, 2026, the UST filed an objection to the Fee App (the "Objection") [Dkt. No. 197]. On February 19, the Trustee filed an untimely response to the Objection (the "Response") [Dkt. No. 199]. On February 20, the UST filed a reply to the Response [Dkt. No. 201].[1]

---

[1] The Trustee's Response states that "the United States Trustee set forth in its Objection in a footnote that the Court should consider the calculation of the Trustee's commissions on the 'lodestar method.'" Based on this, the Trustee seems to assert that not only is the UST objecting to the allowability of the Trustee's commissions under § 326(a), but that they are also objecting to the reasonableness of the commission request under § 330. Response at ¶ 6. However, the UST did not timely raise a reasonableness objection. Nowhere in the UST's Objection does the UST state that the Trustee's commission request is unreasonable under § 330. While the UST does make a counter argument to the reasonableness of the Trustee's fees in the Reply, the Court will not address whether the Trustee's fees are reasonable under § 330 under the loadstar method due to the UST's failure to timely raise this argument in the Objection. For the sake of clarity, however, the Court would also find the Trustee's aggregate commissions and expenses to be independently reasonable under § 330. Neither side briefed the issue of the applicability of the lodestar approach to a chapter 11 trustee's commissions, and the Trustee did not submit time records. However, having presided over this case from inception, and being generally aware of the Trustee's services, the Court finds that the aggregate commissions are reasonable, as are the trustee's expenses.

**DISCUSSION**

The Second Circuit has not previously addressed the issue of whether, under a confirmed plan, a chapter 11 trustee of a surplus estate may seek commissions under § 326(a) for distributions made to equity security holders of a corporate debtor. In fact, caselaw on this issue is sparse. For the following reasons, the Court holds that § 326(a)'s prohibition on commissions to a chapter 11 trustee arising from distributions made to a debtor does not include or extend to distributions made to "equity security holders" of a chapter 11 debtor as defined under 11 U.S.C. § 101(17).

1. ***RELEVANT BANKRUPTCY CODE DEFINITIONS AND PROVISIONS***

   a. **11 U.S.C. §§ 101 and 102**

   Under the Bankruptcy Code, "debtor" is defined as a "person … concerning which a case under this title has been commenced." 11 U.S.C. § 101(13). The term "person" is further defined as an individual, partnership, or corporation. *See id*. § 101(41). According to Debtor's corporate disclosure statement (the "Corporate Disclosure Statement"), Fed. R. Bankr. P. 1007(a)(1), 7007.1, and E.D.N.Y. LBR 1007-4, Debtor is a New York corporation and thus, falls under the Bankruptcy Code definition of a "debtor" [Dkt. No. 4].

   The term "equity security" is defined in relevant part as a "share in a corporation …." 11 U.S.C. § 101(16)(A). The term "equity security holder" is defined as a "holder of an equity security of the debtor." *Id*. § 101(17). As noted in the Corporate Disclosure Statement, the Principal owned 100% of the Debtor's shares [Dkt. No. 4]. Accordingly, under the Bankruptcy Code, the Principal is an equity security holder.

   b. **11 U.S.C. §§ 347, 1122, and 1129**

   In a case commenced under chapter 11, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). While the word "claim" is defined in § 101(5), the word

"interest" is not a defined term under the Bankruptcy Code. Section 1129(b)(1) provides that a court shall confirm a plan if such plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *Id*. § 1129(b)(1). Section 1129(b)(2)(C)(i) states that in order for a plan to be fair and equitable with regards to a class of interests that are receiving or retaining an interest, the plan shall provide that the value of such interest shall be "equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled … or the value of such interest…." *Id*. § 1129(b)(1)(C)(i).

Section 347(b) of the Bankruptcy Code states in relevant part that,

Any security, money, or other property remaining unclaimed at the expiration of the time allowed in a case under chapter 9, 11, or 12 of this title for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any plan confirmed under section 943(b), 1129, 1173, 1191, or 1225 of this title, as the case may be, becomes the property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be.

11 U.S.C. § 347(b); *see also* 11 U.S.C. § 1143 (requiring participation in distribution of a confirmed chapter 11 plan to be taken within five years if the plan requires such participation). It follows that, when a confirmed plan outlines who will receive distributions, such "plan controls what if any actions or conditions to participation in plan distributions are required." *In re Future Trust, Inc.*, 387 B.R. 574, 578 (B.A.P. 8th Cir. 2008). This is supported by the well-established notion that a confirmed plan is a contract that binds the parties involved in the case. *See* 11 U.S.C. § 1141(a); *In re Victory Markets, Inc.*, 221 B.R. 298, 303 (B.A.P. 2d. Cir. 1998) ("[A] confirmed plan holds the status of a binding contract as between the debtor and its creditors."); *Baeshen v. Arcapita Bank B.S.C.(c)* (*In re Arcapita Bank B.S.C.(c)*), 520 B.R. 15, 22 (Bankr. S.D.N.Y. 2014) ("Together the plan and disclosure statement constitute a binding contract among the parties.").

The distribution scheme in chapter 11 is different than for cases commenced under chapter 7, as distributions in such cases are controlled by § 726(a). *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017) ("The Code makes clear that distributions of assets in a Chapter 7 liquidation must follow [§ 726(a)]. It provides somewhat more flexibility for distributions pursuant to Chapter 11 plans, which may impose a different ordering with the consent of the affected parties."); 11 U.S.C. §§ 726(a)(1)–(6); *In re Sheehan Mem'l Hosp.*, 507 B.R. 802, 803 (Bankr. W.D.N.Y. 2014) ("If the debtor were liquidated under Chapter 7, property of the estate would be distributed in accord with the provisions of 11 U.S.C. § 726(a).").

## 2. DEBTOR'S PLAN DEFINITIONS AND TREATMENT OF EQUITY INTERESTS

Under § 1123(b)(6), "a plan may include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Plan provisions "that override, undermine, or rewrite relevant Bankruptcy Code provisions" are not authorized. *See Davis v. Elliot Mgmt. Corp.* (*In re Lehman Bros. Holdings Inc.*), 508 B.R. 283, 288 (S.D.N.Y. 2014).

Under Article I of the Plan, Debtor included several relevant definitions, all of which comply with § 1123(b)(6) because they do not "override, undermine, or rewrite" their respective Bankruptcy Code definitions under § 101. Paragraph 1.15 defines "Debtor" as "South Broadway Realty Enterprise Inc." Paragraph 1.16 defines "Debtor's Principal" as "Francesco Guerrieri, president and one hundred percent (100%) shareholder of the Debtor." These Plan definitions are wholly consistent with their applicable definitions under 11 U.S.C. § 101.

Paragraph 1.24 defines "Equity Interests" as "holders of equity of the Debtor." While this definition is labeled differently as "equity security holder" under 11 U.S.C. § 101(17), the meaning of the term is the same and is therefore also consistent with the Bankruptcy Code definition.

Article III of the Plan outlines the treatment of claims and equity interests. According to paragraph 3.01, Class 7 consists of the equity interests of the Debtor and provides that "Class 8 Claimants shall not retain their existing pre-petition Equity Interests in the Debtor as of the Effective Date. Equity shall receive a distribution after the payment of all allowed claims in full." However, there is no Class 8 under the Plan, but it is clear that "Class 8" was supposed to be "Class 7." Furthermore, the term "Equity" is not defined under either the Plan or the Bankruptcy Code. Based on a reading of the Plan as a whole, the term "Equity" was clearly intended to mean "Equity Interests." Any other interpretation of these provisions would be inconsistent with the other definitions and provisions of the Plan.

3. **11 U.S.C. §§ 326(a) and 330**

The Bankruptcy Code generally permits a court to award a trustee reasonable compensation for actual and necessary services rendered. 11 U.S.C. § 330(a)(1)(A). However, § 326(a) states in relevant part that, "[i]n a case under chapter 7 or 11 … the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services … upon all moneys disbursed … by the trustee to parties in interest, *excluding the debtor*…." *Id.* § 326(a) (emphasis added).

4. **LIMITED CASELAW**

As stated previously, the Second Circuit has not addressed the precise issue before the Court. In fact, no Circuit has addressed this issue with respect to a chapter 11 surplus estate. As a result, both the Trustee and the UST rely exclusively on cases that they believe are analogous which were decided under chapter 7 and outside the Second Circuit. The district court for the Southern District of Mississippi recently addressed this issue and the facts are nearly parallel to the facts here.

In *In re VCR I, LLC*, No. 23-CV-37, 2024 WL 1394507, at \*1 (S.D. Miss. Mar. 30, 2024), the corporate debtor was 100% owned by a company named LULU I, LLC ("LULU"). The debtor originally filed under chapter 11, but the case was later converted to chapter 7. *Id*. In the "Trustee's Final Report," the chapter 7 trustee sought compensation under § 326(a) for a \$2,643,066.16 disbursement made to LULU. *Id*. at \*2. However, the United States Trustee objected on the basis that § 326(a) prohibited the chapter 7 trustee from including this distribution to LULU. *Id*. The bankruptcy court for the Southern District of Mississippi sustained the United States Trustee's objection and the chapter 7 trustee appealed.

The district court affirmed and held that, "because LULU owns 100% interest in VCR–a dissolved company–it functionally stands in lieu of the debtor for purposes of 11 U.S.C. § 726[(a)](6)." *Id*. at \*3. The court based this conclusion on several grounds. First, the court asserted that a distribution to LULU does not "reframe the intention to disburse all remaining funds to the debtor" because had LULU not been a stand-in for the debtor, the chapter 7 trustee would have been prohibited from distributing the surplus to LULU. *Id*. Second, the district court acknowledged that this issue had not come before the Fifth Circuit and thus, looked for guidance elsewhere. The court looked at a decision from the bankruptcy court for the District of Columbia, *In re National Emergency Med. Ass'n.*, No. 19-00026, 2020 WL 3167696, at \*1 (Bankr. D.D.C. June 11, 2020).

In *National Emergency*, in accordance with an agreed upon order of distribution, the chapter 7 trustee was to be paid a 5% commission for the distribution of surplus funds to three (3) nonprofit entities that stood in the shoes of the now-dissolved debtor. *Id*. The court disapproved the commission on the basis that the distributions are "similar to distributions to heirs of a deceased individual debtor, distributions that still must be treated as distributions to the debtor." *Id*. at \*2. This Court does not find either *VCR I* or *National Emergency* to be persuasive here.

## 5. STATUTORY INTERPRETATION AND CONGRESSIONAL INTENT

The Supreme Court of the United States, the Second Circuit, and this Court have all acknowledged that construing a statute such as the Bankruptcy Code is a "holistic endeavor" with the starting point being the language of the statute itself. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *IRS v. WorldCom, Inc.* (*In re WorldCom, Inc.*), 723 F.3d 346, 360 (2d. Cir. 2013); *Weisfelner v. Fund 1.* (*In re Lyondell Chem. Co.*), 503 B.R. 348, 366 (Bankr. S.D.N.Y. 2014); *In re Phillips*, 485 B.R. 53, 56 (Bankr. E.D.N.Y. 2012). If the language of the statute is clear, a court is to apply the express words chosen by Congress. *U.S. v. Bulloch*, 165 F.4th 676, 683 (2d. Cir. 2026). From there, a court must then look at the provisions of the statute as a whole, including its objective and the underlying policy considerations in conjunction with those objectives. *Kelly v. Robinson*, 479 U.S. 36, 43 (1986); *In re Lyondell Chem. Co.*, 503 B.R. at 367 (quoting *Cap. Commc'ns Fed. Credit Union v. Boodrow* (*In re Boodrow*), 126 F.3d 43, 49 (2d. Cir. 1997).

## ANALYSIS

Since the Court has already confirmed the Plan, the Court need not again analyze whether the Plan provisions are permissible or if they comply with the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(1). Thus, the Court must first begin its analysis by looking at the plain language of § 326(a) and, if necessary, the underlying objective and policy considerations of the statute.

### 1. *EQUITY SECURITY HOLDERS ARE NOT THE DEBTOR*

#### a. Plain Language of § 326(a)

Section § 1122(a) provides that a plan may place a claim or an interest into a particular class so long as the claim or interest is substantially similar to the other claims or interests of such class. Paragraph 3.01 of the Plan does so, as Debtor created seven (7) classes, with the seventh class consisting of the equity securities of the Debtor. Since the Principal was the 100% equity

security holder of the Debtor, he stood alone in this class. This classification under the Plan is permissible under § 1122(a).

The Plan clearly provided that the Principal was not going to retain his existing pre-petition equity interest in Debtor as of the effective date of the Plan, but he was to receive a distribution after all allowed claims were paid in full. The Plan did not provide that the surplus would be distributed to the Debtor to then be paid to the Principal; rather, the distribution was to be made to the Principal on account of his pre-effective date equity securities.

The crux of the issue here, as noted by the parties, is the definition of "debtor" under § 101 and its proper interpretation under § 326(a). While the term "debtor" seems facially unambiguous, the UST contends that the term "debtor" should also be read as to include "functional equivalent(s) of the debtor."

As stated in the Objection, the UST's main argument is that the Principal, in receiving his distribution in accordance with the Plan, is essentially standing in the shoes of the Debtor as its "functional equivalent." While that argument is plausible, it is not what the Plan or the Bankruptcy Code provides as the Principal, an equity security holder, is clearly not the Debtor according to § 101. Had Congress intended to include equity security holders as defined in § 101(17) or "functional equivalents" of a debtor in the prohibition of § 326(a), it would have explicitly done so. However, Congress did not include these terms within § 326(a) as the statute only excludes a commission on monies disbursed to a "debtor." Thus, the term "debtor" cannot be said to also include equity security holders or functional equivalents of a debtor.

### b. Policy and Objective of § 326(a)

This conclusion is further supported by the objective and policy underlying § 326. Section 326 sets certain limitations and restrictions regarding how much a trustee may be compensated for their services. Based on the plain language of the statute, the reasonableness limitation of § 330

applies to any compensation that is allowed to a chapter 7 or chapter 11 trustee so as to maximize the distribution of assets to creditors. Once creditors have been paid in full, with interest, allowing the trustee to receive a commission on distributions to equity security holders cannot be said to injure or even impact creditors. Equity security holders are not creditors. Further, it is clear that Congress excluded compensation of a chapter 11 trustee for distributions made to individual debtors under chapter 7 and chapter 11 but simply did not do so with respect to equity security holders of non-individual debtors. Applying the objective and policy behind § 326 to the facts here, the distributions to the Principal cannot be said to go against the overall purpose of § 326(a).

## CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the UST's Objection is overruled; and it is further

**ORDERED**, that the Trustee's Fee App is approved in its entirety, the Trustee is awarded total commissions of $141,034.71 based on disbursements of $4,126,156.66, and reimbursement of expenses of $368.00.

Dated: March 18, 2026
Central Islip, New York

_____
Alan S. Trust
Chief United States Bankruptcy Judge